Commonwealth, Appellant, *v.* Moogerman.

Argued April 30, 1956.   Before Stern, C. J., Jones,
Bell, Chidsey, Musmanno and Arnold, JJ.

*Marvin Garfinkel,* Deputy Attorney General, with him *Herbert B. Cohen,* Attorney General, for appellant.

No argument was made nor brief submitted for appellee.

OPINION BY MR. JUSTICE MUSMANNO, May 25, 1956:

Miss Lois Moogerman, 20 years of age, and student at the University of Pittsburgh, drives a Cadillac car. On May 15, 1955, while returning with a girl friend from a visit to Penn State College and proceeding over a back road, she was arrested for driving at a speed not warranted by the conditions of the highway. She was charged with violating The Vehicle Code, Section 1002(a), 75 PS 501(a), and paid a fine of $10. On September 3, 1955, less than four months later, she was apprehended by a State trooper while driving over Route 22 at a speed of 85 miles per hour near Blairsville, Indiana County, where the speed limit was 50 miles per hour.

Upon the showing of these facts, the Secretary of Revenue suspended Miss Moogerman's motor vehicle operating privileges for a period of 90 days. She appealed to the County Court of Allegheny County which, by sustaining the suspension and yet allowing the defendant a limited license, both approved and disapproved the Secretary's action. This self-contradictory order cannot be sustained. In its disposition of this case the County Court misapprehended its authority and function under The Vehicle Code. Section 615(b) of the Code, as amended, authorizes the Secretary of Revenue to suspend the operating privilege of any person whenever he finds upon sufficient evidence that such person has violated the motor vehicle laws. Section 616, as amended, provides that any person whose operator's license has been so suspended may petition

for a hearing in the Court of Common Pleas of the county where he resides (County Court in Allegheny County), and it shall then be the duty of such court to take testimony, examine into the facts of the case, and "determine whether the petitioner is subject to suspension of operator's license . . . under the provisions of this act."

Although the Court then hears the case de novo it must in its decision still stay within the limits of its jurisdiction as bounded by the Code and by the decisions of the appellate courts of the Commonwealth. In the case of *Commonwealth v. Garman,* 361 Pa. 643, the operator's license of B. S. Garman was suspended by the Secretary of Revenue on the grounds of incompetence. The motorist appealed to the Court of Common Pleas of Snyder County which sustained the suspension "in so far as it prohibits B. S. Garman from operating a motor vehicle generally," but it still allowed him to "operate a motor vehicle in his business as a carpenter and planing mill operator." This Court reversed the action of the Snyder County Common Pleas Court and remanded the record for the entry of an order, "which sustains or reverses the action of the Secretary of Revenue," saying: "As far as The Vehicle Code is concerned, it provides, as already stated, that the court hearing the matter is to determine *'whether the petitioner is subject to suspension of operator's license'*; that question must be answered by the court *either affirmatively,* in which case it should sustain the suspension ordered by the Secretary, *or negatively,* in which case it should reverse the suspension and direct a reinstatement of the license. The order made by the court below failed to adopt either of these alternatives and was therefore beyond the limits of the discretion entrusted to it by the statute." (Emphasis supplied.) In the case at bar the County Court of Alle-

gheny did just the opposite. It acted both affirmatively and negatively. Such an action must fail.

In *Bureau of Highway Safety v. Wright,* 355 Pa. 307, this Court said: "Upon an appeal from a suspension by the Secretary of Revenue of an operator's license, it is not only the duty of the court to hear *de novo* the witnesses for the Commonwealth and those for the licensee, but it is also the court's duty 'to determine anew [*from the testimony taken*] whether the operator's license should be suspended': see Commonwealth v. Funk, supra, at p. 399, quoted in like connection a number of times and uniformly followed."

Thus, the question before the Court below was a simple one: From the testimony in the case was Miss Moogerman's operator's license to be suspended? If the facts supported a suspension, the appeal was to be dismissed, and if they did not, the appeal was to be sustained. The County Court did not follow that procedure. It adopted a *parens patriae* attitude. It acted like a philosophical but indulgent parent who recognizes and deplores the mischief committed by his child but lacks the hardihood to discipline him for it.

We said further in the *Wright* case: "The jurisdiction conferred by Sec. 616 of the Vehicle Code upon courts of common pleas [and County Court] does not authorize them to act either arbitrarily or capriciously with respect to the reinstatement of a suspended license. There must be a justifiable factual basis for the court's action in the premises."

The decision of the County Court in the case at bar, if unreversed, would tend to give ballast to the unsubstantiated notion that the Courts may be called upon to function as ex officio pardon boards to mitigate the penalties which the Legislature empowered the Secretary of Revenue to impose under given conditions. But the County Court and the Courts of Common Pleas are

not boards of clemency; they are strictly courts of law; they are bound by rules of legal procedure and their decisions must be founded on firm jurisprudence, not fluctuating policy. There is no warrant in statute for the County Court to say as it did here: "The Court in the instant case in its decision is following a policy of the County Court of Allegheny County in granting restricted licenses in cases of similar circumstances." Courts interpret and expound laws; they do not lay down policies.

The Court below said further: "If mere speed alone, in excess of the speed limits fixed by the Code, was sufficient to justify the Secretary of Revenue in suspending driving privileges, there would be no point in the Legislature's vesting of broad discretionary powers in the courts of this commonwealth." With this type of argument the lower Court takes a rather detached view of the awesome phenomen of speed. To speak of excessive speed as "mere speed alone" is like saying "mere dynamite alone." Speed invariably connotes danger of some kind. It is speed that makes a bullet a mortal instrument. Without speed a bullet would be an innocuous bit of lead or steel with which a child could play harmlessly. It is the speed of a car which converts it from a carriage of pleasure and usefulness into a juggernaut of destruction.* The motorist in this case was driving at 85 miles per hour, which is an illegal speed, except at auto races, on any highway in Pennsylvania.

It is perhaps too late to attempt to slacken the furious tempo of the 1950's. Everyone seems to be in a vertiginous hurry to get somewhere, although not everyone knows why. But in this headlong racing for near

---

* Melville F. Ferguson, Editor of the Philadelphia Bulletin, in an editorial of May 28, 1956, made the apt statement: "Very few people have been killed by stopped automobiles."

or distant destinations, motor journeys often end at unintended termini. Of the 29,800 persons killed in auto accidents in 1955, 12,700 or 42.6% lost their lives as the result of cars operating at excessive speed limits. Of the 1,760,800 persons injured in motor accidents last year, 702,560 or 39.9% were hurt because of cars travelling at speeds forbidden by law.

It requires no demonstration to prove that the faster an automobile travels, the greater difficulty the driver encounters in controlling it. Every upward sweep of the speedometer needle forces the car closer to the accident trap travelling in front of it, always ready to receive and engulf it in disaster. Every increase in speed of five miles adds an augmentation of danger which surpasses that which accompanied the preceding ten-mile increase. Thus, the advancing of speed from 70 to 75 miles per hour brings into play more elements of peril than rode with the increment from 60 to 70 miles per hour. According to the Virginia Judicial Notice of Stopping Speed Act of March 31, 1956 (Sec. 46-285.1 Code of Virginia), a motor vehicle will travel three times farther after the application of brakes at 85 miles per hour than it would at 50 miles per hour. Counsel for the Commonwealth in their brief make the significant statement: "According to the June 1950 Bulletin of the National Safety Council the death risk (i.e. number of fatal accidents per 1000 personal injury accidents) at a cruising speed of 45 miles per hour is 61, at 55 miles per hour it is 85, and at 60 miles per hour it is 160." One may only guess the figure at 85 miles per hour.

The County Court said in its Opinion that it was moved to restoration of the operating privilege in this case because of "an exhaustive search of the cases in the lower Courts of the Commonwealth." It might not have been unhelpful to the County Court if it had taken at least a perfunctory glance at some of the decisions

of the *upper* Courts of the Commonwealth. It might have found some enlightenment, for instance, in the case of *Oesterling Appeal,* 347 Pa. 241. There the Secretary of Revenue suspended the operating privileges of the involved motorist for a period of 90 days because of violation of the speed laws. The Court of Common Pleas of Venango County reversed the suspension on the theory that the Legislature could not have intended to authorize suspension merely upon a showing of operation at an illegal speed or it would have provided for mandatory suspension in all such cases. But this Court categorically rejected that argument with the statement: "With this we cannot agree. As said in Commonwealth v. Funk, supra, (p. 397): 'Suspension of the licensee's operating privilege is authorized . . . when the Secretary finds upon sufficient evidence that the offenses enumerated have been committed . . . The Secretary of Revenue [fulfills] the statutory mandates by holding the hearing and by finding [upon sufficient evidence] that the [licensee has] violated the motor vehicle laws of this Commonwealth.' " In this *Oesterling* case, as in the *Garman* case, the record was remanded with directions that the lower Court either sustain or reverse the action of the Secretary of Revenue.

This Court has frequently reversed the decision of lower Courts which have reinstated operators' licenses after the Secretary had suspended them because of excessive speed. In *Commonwealth v. Emerick,* 373 Pa. 388, we reversed where the motorist had operated his car at 80 miles per hour and the lower Court had restored his operator's license which had been suspended by the Secretary of Revenue. We said there: "But on a hearing de novo, on appeal, the court of common pleas while entitled to act independently in the exercise of its discretion, must, nevertheless, act in accordance with the evidence and circumstances presented."

In *Commonwealth v. Matil,* 373 Pa. 404, we sustained a suspension where the motorist drove at 70 miles per hour; the same was true in the cases of *Commonwealth v. Cornetti,* 373 Pa. 407, *Commonwealth v. Roher,* 373 Pa. 409, and *Commonwealth v. Starcher,* 373 Pa. 411. In *Commonwealth v. Gaiser,* 373 Pa. 413, we sustained a suspension based on a speed violation of 65 miles per hour.

The County Court feared that by determining "license suspensions on the basis of speed alone" it would be merely "fulfilling the duties of the courts of the minor judiciary." This is a fear without substance. Every Court of record is a repository of discretion acting within the confines of the statute under which it operates. No judge worthy of the robe would, for example, sustain the suspension of an operator's license upon evidence that the motorist was taking a seriously injured person to the hospital at the time he exceeded the speed limit. By the same token a patently disproportionate period of suspension of operating privilege would not be allowed to stand on appeal. Nor would it be proper to deprive a motorist of his driving privileges if, by way of illustration, with an exemplary driving record behind him, he had on an occasion, without mishap, driven 55 miles per hour where the speed limit was 50 miles per hour. A judge is a judge and courts are established to do justice. But a court may not, as in the case at bar, ignore evidence, slight the law, and release with but a slight reproof a motorist who says that, although she was driving 85 miles per hour: "I didn't realize I was going that fast and it is very hard to adjust the car."

A person who flies over the road at breakneck speed and is unaware of that direful fact may well need a period of 90 days' reflection in order, if not to adjust the car, at least to adjust himself or herself to the ap-

preciation of the safety of others lawfully on the highway.

The order of the County Court of Allegheny is reversed and the order of the Secretary of Revenue is reinstated.